## SOUTHERN RAILWAY COMPANY v. J. E. LATHAM AND GREENSBORO WAREHOUSE AND STORAGE COMPANY.

### (Filed 13 November, 1918.)

1. **Carriers of Goods—Freight Rates—Legal Rates—Agreements—Federal Statutes—Interstate Commerce Commission—Corporation Commission.**

   The rates of transportation allowed carriers of freight are those established by the Interstate Commerce Commission, under the Federal statutes as to interstate commerce, and by the State Corporation Commission, under the State statutes as to intrastate commerce, which may not be affected by any agreement to the contrary between the carriers or their agents or employees and the shipper; and, notwithstanding such agreement, the carrier may demand and enforce the rates established by law.

2. **Same—Intermediate Points—Credit Allowances—Discrimination.**

   Where, under legally established tariffs, a shipper is allowed as a credit upon the amount of full transportation charges, on a certain commodity, freight he had prepaid to a certain intermediate point, by way of an "expense bill," and to be established in a specified way, but requiring that the further transportation to destination be made before a certain date in each year, any agreement made to the contrary between the carrier and the shipper, respecting a later date than that allowed and established pursuant to the law, amounts to an unlawful discrimination, and is unenforcible. The objection that the pleadings in this case were directed solely to the agreement, and that recovery by the carrier should not therefore be allowed, is untenable.

ACTION, tried before *Adams, J.,* and a jury, at April Term, 1918, of GUILFORD.

The action is to recover by reason of freight charges on shipments of cotton made by defendants over plaintiff road in September, 1910, and, thereafter, to various points in and beyond borders of the State, the balance due on such charges alleged in the complaint amounting to $1,192.76. On denial of liability, the case was heard on the three following issues:

1. Did the plaintiff and the defendants enter into an agreement by

27—176

the terms of which the defendants were to pay to plaintiff the freight for the several shipments set out in the complaint?

2. Were the various articles set out in the complaint reshipped after 31st August following the date of the original shipments to Greensboro?

3. In what amount, if any, are the defendants indebted to the plaintiff for unpaid freight?

The first of these issues was submitted to the consideration of the jury and answered "No." The second was answered "Yes," by consent, and third not answered, the court having instructed the jury that if their answer to first issue should be "No" the third issue need not be answered.

Judgment on the verdict for defendants, and plaintiff excepted and appealed, assigning errors.

*Wilson & Frazier for plaintiff.*
*R. D. Douglass for defendant.*

HOKE, J. There seems to be no substantial difference between these parties as to the essential facts of the controversy. From the admissions in the pleadings and the facts in evidence, it appears that plaintiff railroad, a common carrier of inter and intrastate commerce, in obedience to and in accordance with the Federal and State statutes applicable and the rules and regulations of the Interstate Commerce Commission and of the Corporation Commission of North Carolina, has duly established a schedule and tariff of rates in shipments of freight into and out of Greensboro, N. C., and that the same were in force at the time of the shipments of cotton, the subject-matter of the suit; that under a provision of these tariffs, both Federal and State, according to the respective character of the shipments, there was a warehousing privilege open to defendants and other dealers in like case, by which, as shippers of cotton into Greensboro from other points, they were privileged to ship it out. (when a back haul was not involved) within the life of the "expense bill" allowing the through rates from the point of origin to final destination, the shippers producing the original freight bills covering such inbound cotton to show they were entitled to the privilege of using sums originally paid in satisfaction of or payments on the amount due for the entire distance.

In reference to this privilege, another provision of the established tariffs is "That paid freight bills for cotton handled under this arrangement will not be accepted for shipment after 31st August following the date upon which they were made"; that a large amount of cotton shipped into Greensboro by defendants over plaintiff railroad prior to 31 August, 1910, was shipped out again after that date, principally in September and October following, to different points in and out of the

State, and the amount due for freight thereon, according to the established rates out of Greensboro, aggregated the sum of $1,200 and over; that the duplicate bills of lading on these reshipments produced at the trial contained words "order notify" and "freight prepaid," and the oral evidence in reference to the meaning of this last entry was that it signified that shippers were to prepay the freight in protection of the ultimate consignee; that defendants, on these shipments, had paid only a small amount in money, not as much as $20, and had undertaken to settle the amount due on the basis of a through rate charge from the original point of shipment to the final destination and to satisfy the sum so estimated by means of these "expense bills"—that is, the amount of freight paid on the original shipments into Greensboro—and this when, according to the provisions of the tariff applicable, the time of the "privilege" had expired and these shipments were no longer available for the purpose.

From these the facts chiefly relevant, admitted or not seriously controverted, it is clear that defendants are responsible for the amount properly due for these shipments, both as consignors under the bill of lading presented and under the express agreement that they were to prepay the freight in protection of the designated consignee, and, further, that this amount must be determined by the rates of the schedules and tariff established, pursuant to law. *Tex. Pac. Ry. v. Mugg & Dryden,* 202 U. S., 242; *Central of Ga. Ry. v. Birmingham Sand and Brick Co.,* 9 Ala. App., 419; *Baltimore, etc., Ry. v. New Albany, etc., Basket Co.,* 48 Ind. App., 647; *Holt v. Westcott,* 43 Me., 445; *Ashboro Wheelbarrow Co. v. Ry.,* 149 N. C., 261.

In *Ry. v. Mugg, supra,* in the 50 Lawyers' Ed., U. S. Sup. Ct. Rep., 1011, the syllabus of the decision is given as follows: "A common carrier may exact the regular rates for an interstate shipment as shown by its printed and published schedule on file with the Interstate Commerce Commission and posted, etc., as required by the Interstate Commerce Act, although a lower rate was quoted by the carrier to the shipper who shipped under the lower rate so quoted."

In the case from Indiana Court of Appeals, *supra,* it was held, among other things:

"(1) That one who engages a railroad company to transport freight in interstate commerce is liable for the established rate on such freight regardless of any contract the shipper may have with the consignee.

"(4) A shipper must take notice of the rates for interstate shipments, and he relies at his peril on the statements of the carrier's agents.

"(5) An interstate carrier is not estopped from recovering the balance due for a shipment by the unauthorized act of its agent in quoting an illegal freight rate."

In *Central of Ga. Ry. v. Birmingham Sand and Brick Co., supra,* the principles applicable are given as follows:

"(1) A carrier may look either to the consignor, with whom the contract of shipment is made, or to the consignee for the freight.

"(3) Under the Interstate Commerce Act, the freight rate of an interstate shipment is not that named in the bill of lading or contract of shipment, but the lawful rate existing at the time, whether or not such rate is known to the consignor or the consignee, and regardless of whether the parties were misled by the carrier as to the lawful rate or whether it had posted the lawful rate as required by the statute; hence the carrier cannot by any act estop itself from demanding the lawful rate."

And in 43 Me., *supra:* "In all cases where goods are shipped by a consignor under a contract or for his benefit, he is originally liable for the freight."

These being the correct and controlling positions on the subject, recognized both in Federal and State decisions, there was error to plaintiff's prejudice in making the rights of the parties to depend on an answer to the first issue in defendant's favor, that issue referring to the amount due for freight by the agreement had between them, and the jury having answered the second issue "Yes," thereby determining that the time of the interfering privilege had expired, the freight due and collectible for these shipments is that fixed by the law and may not be changed or modified by agreement between the shipper and the carrier's agent.

It is urged for defendants that this position is not open to plaintiffs for the reason that in his pleadings he has based his right to recover on an express agreement to pay a stated amount of freight, and this issue having been found against plaintiff it is precluded from insisting on any other or further recovery; but this view is entirely too restricted, and, without going into a full statement of the pleadings, we are all of opinion that the allegations of the complaint are fully broad enough to cover this phase of plaintiff's demand and are designed and well framed for the purpose.

It is coming to be more and more recognized that, with a minimum of official interference, a government is required at times to establish regulations to afford its citizens equal opportunity in their industrial and. commercial life—a requirement that is nowhere more imperative than in preventing discrimination among shippers of freight with our public service companies. These statutes enacted for this purpose and the rules and regulations thereunder designed to effect as far as possible an equal charge for like service among all shippers, permit no deviation by agreement or attempted adjustment of the parties. Not only so, but

the companies, as stated by his Honor, are directed and enjoined to exhaust all legal remedies in enforcement of the established rates.

On the record and facts in evidence, as they now appear, we are of opinion that plaintiff is entitled to recover the balance due for these shipments on the basis of freight charges established pursuant to law, and this will be certified that the amount may be ascertained and determined in response to the third issue.

New trial.